# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

WENDY L. SWAN,

               Plaintiff,

vs.

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

               Defendant.

No.  1:16-CV-0112-LTS

**REPORT AND RECOMMENDATION**

---

Plaintiff Wendy Swan seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DI) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  Swan argues that the administrative law judge (ALJ), Jo Ann Draper, erred in determining residual functioning capacity (RFC) because she did not give sufficient weight to the opinions of Swan's treating psychiatrist and treating psychologist.  I recommend affirming the ALJ's decision.

## I.    BACKGROUND

Swan was born in 1962 and suffers from depression, anxiety, and attention deficit hyperactivity disorder (ADHD).  AR 15, 63.[2]  She has received psychiatric treatment and taken various antidepressants and antianxiety medications since at least 2006.   AR 320,

---

[1] Commissioner Berryhill is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] "AR" refers to the administrative record below.

330, 350. Since November 2009, psychiatrist Dr. Bryan Netolicky has treated Swan every one to three months. AR 467. In July 2012, Swan began seeing psychologist Dr. Angela Perkins biweekly after being referred by Dr. Netolicky. AR 449, 472. During her first session with Swan, Dr. Perkins administered several neurophysiological tests, including cognitive and personality tests. AR 448-55.

Swan completed high school and went to college for two years, training to become an x-ray technician. AR 450-51. She worked as an x-ray technician for a year until being fired. AR 450. She then worked in another field until 2002, when her mental health began to deteriorate. *Id.*

From the summer of 2002 until the winter of 2005, Swan worked at a Catholic church a few days a week. AR 36-37, 190, 241, 243. She spent ten hours a week cleaning the priests' residence, preparing meals, and doing laundry, and she spent ten to twenty hours a week acting as the volunteer coordinator. *Id.* She testified that she was able to take many breaks while acting as a housekeeper and that her boss for the volunteer-coordinator position—a Catholic priest—acted "like a therapist," listening to her when she was upset, crying, or paranoid. AR 41-42. It is not entirely clear why Swan left this job, but she testified that she was a parishioner of the church while working there and that she no longer attends this church because she moved. AR 42. Treatment notes from January 2006 also indicate that Swan said she "gets restless after working at any place for three years." AR 350.

For a few months in both 2006 and 2007, Swan worked as a stock clerk and cashier at two different retail stores. AR 37-38, 190, 241. In both positions, she worked around twenty hours a week and stocked merchandise, performed inventory checks, and worked as a cashier when needed. *Id.* She testified that with both jobs, she became anxious that she would make a mistake or that she was going too slow (and was moved to tears on at

2

least one occasion). AR 38-39. She eventually quit when she became too panicked and stressed to stay at work. *Id.*

For about a month in 2006, Swan worked at a tuxedo shop six days a week. AR 348-49. Like her other retail jobs, working with the public made her overwhelmed and anxious, and she eventually quit. *Id.*

In 2010, Swan applied for and was denied DI benefits. AR 85-88. According to Swan, the Social Security Administration found that she could perform factory work, so in June 2013, she started a job at a factory. AR 43, 301. She worked the night shift, assembling foam parts for chairs as part of a team. AR 43, 494. She lasted only two months before quitting. *Id.* The work made her tired, paranoid about staying on pace, and anxious about slowing her team down. *Id.*

In September 2013, Swan worked five to ten hours a week for a friend, helping paint craft projects that the friend sold in stores. AR 490. By April 2014, she had quit because she could not stand the friend's comments. AR 471, 483. Shortly thereafter, in June 2014, Swan began helping a friend paint and patch holes in ornamental concrete.[3] AR 51, 479. At the time of the hearing in September 2014, she was still doing this work once or twice a week. AR 29, 51. She was also cleaning an elderly woman's house once every few weeks at the time of the hearing. AR 43-44.

Since at least 2002, Swan has also worked for herself, making jewelry at home. AR 44, 241, 301, 450. During 2014, the most she made in a month from this work was $561, and that does not include the cost of supplies. AR 45-46. At one time, she worked on jewelry four days a week for up to four hours at a time. AR 44, 242. She testified

---

[3] It seems that this is a different job than the one she had previously quit (and a different friend), but it is not entirely clear from the record.

at the hearing, however, that now she can only work on her jewelry for a maximum of two hours. AR 44. Over the years, she has sold her jewelry at craft shows and in stores. AR 45, 348. Since at least 2006, she has sold her jewelry in a store that requires her to work in the store a few times a month, waiting on customers and cleaning. AR 45-46, 350. She testified that she used to work at the store four times a month but felt she was being used because "no one else would work that much." AR 45-46. At the time of the hearing, she worked at the store two times a month. *Id.* Although she has occasionally had difficulties interacting with people at the store, she works with a good friend who listens to her and is able to calm her down. AR 46-47. Swan testified at the hearing that she no longer had the passion for making jewelry that she once had. AR 44. Treatment notes from April 2014 state that she had lost interest in jewelry making, and a letter from her friend in July 2014 states the same. AR 300, 483. She had previously gone through a similar phase in March 2010 and May 2011. AR 342, 462-63.

Swan is able to perform many activities of daily living. AR 18-19. She prepares meals, does laundry, cleans, takes care of her dog and cats, and bathes and dresses herself. AR 195-97, 214-15, 261-62. She is able to drive and run errands alone, and she shops for groceries once a week. AR 263. She pays bills and can handle a savings account. AR 214, 263. She visits friends' houses and attends church on Sundays. AR 264. She enjoys reading, watching television, coloring, and making crafts. *Id.*

Swan filed an application for DI on January 29, 2013. AR 13, 74. She submitted as evidence checklist forms prepared by Drs. Netolicky and Perkins assessing her mental RFC. AR 467-76. Drs. Netolicky and Perkins evaluated Swan's mental RFC by determining her ability to perform certain work-related activities using the following categories: unlimited, limited but satisfactory, seriously limited, unable to meet competitive standards, or no useful ability to function. AR 469, 474.

4

Both Drs. Netolicky and Perkins found that while Swan had some difficulties, she could satisfactorily understand, remember, and carry out simple instructions; make simple work-related decisions; request assistance; be aware of and take appropriate precautions to normal hazards; and adhere to basic standards of personal hygiene and grooming. AR 469-71, 474-76. They also both found that Swan is seriously limited in her ability to remember work-like procedures; to maintain regular attendance; to understand, remember, and carry out detailed instructions; and to interact appropriately with the public. *Id.* And they both found that she is unable to meet competitive standards in the following areas: maintaining attention for two hours; sustaining an ordinary routine without special supervision; working in coordination with others without being unduly distracted; responding appropriately to changes in a routine setting; dealing with the stress of semiskilled or skilled work; and maintaining socially appropriate behavior. *Id.* With regard to interacting appropriately with the public and maintaining socially appropriate behavior, Dr. Netolicky handwrote a note in the margins explaining his assessment: "I think she might begin [to] perform satisfactorily . . . but I don't think she would be able to sustain [it] (as demonstrated by her history)." AR 470. Both doctors also indicated that Swan was utterly unable to complete a normal workday or work week without interruptions from psychologically based symptoms and that her impairments would cause her to miss more than four days of work a month. AR 470-71, 475-76.

Drs. Netolicky's and Perkin's RFC assessments differed by one level of severity in several instances. AR 469-71, 474-76. Dr. Netolicky found Swan seriously limited, and Dr. Perkins found Swan unable to meet competitive standards, in her ability to perform at a consistent pace without an unreasonable number of rest periods and in her

ability to get along with coworkers.[4]  AR 470, 475.  In the categories of responding appropriately to criticism from supervisors and dealing with work stress, Dr. Netolicky found Swan unable to meet competitive standards, and Dr. Perkins found her completely unable. *Id.*  Finally, Dr. Perkins found Swan seriously limited, and Dr. Netolicky found Swan unable to meet competitive standards, in her ability to set realistic goals or make plans independently of others.  *Id.*

At the end of their RFC assessments, both doctors wrote a brief blurb summarizing their evaluation of Swan.  Dr. Netolicky explained:

> [Swan] gets very anxious and depressed easily, especially when stressed [or] overwhelmed.  She has worked consistently with Dr. Perkins [and] me and has consistently expressed persistent difficulties in the above domain.  As recently as our [April 30, 2014] visit, she had attempted a painting job which she could not sustain [and] was forced to quit.

AR 471.  Similarly, Dr. Perkins opined that Swan would have difficulty working due to her "[p]rofound limitations in stress reactivity with limited resiliency [and] ability to effectively utilize coping strategies" and her tenuous "[s]ocial [and] interpersonal relationships . . . with persecutory ideation [and] personalization tendencies."  AR 476.  Dr. Perkins also noted that Swan's "history is punctuated by failed attempts at employment secondary to these issues."  *Id.*

The Commissioner denied Swan's application for DI benefits initially and upon reconsideration.  AR 89-96.  In connection with those determinations, state agency

---

[4] Regarding Swan's ability to get along with coworkers, Dr. Netolicky marked both "seriously limited" and "unable to meet competitive standards" and drew an arrow from the latter to the former.  AR 470.  It seems to me that he initially marked the more serious descriptor and then changed his mind, using the arrow to indicate his final choice.  In any event, because the ALJ's RFC determination includes that Swan cannot work in close proximity with others (AR 17), it does not matter what Dr. Netolicky meant by this notation.

medical consultants David A. Christiansen, Ph.D, and Myrna Tashner, Ed.D, reviewed Drs. Netolicky's and Perkins's treatment notes and prepared forms assessing Swan's mental RFC. AR 21, 70, 82. Drs. Christiansen and Tashner found "claimant's allegations . . . credible and supported by clinical and statistical evidence." AR 70, 82. They recognized that while Swan had trouble concentrating, she could do so for short periods of time. AR 69-70, 72, 80, 84. They also found that she had no difficulties understanding and carrying out short and simple instructions, but moderate difficulties with detailed instructions. AR 68-69, 80. Drs. Christiansen and Tashner found that Swan could maintain socially appropriate behavior but would have difficulties interacting with coworkers and the public. AR 69, 80-81. They also found that she was moderately limited in her abilities "to perform activities within a schedule, maintain regular attendance, and be punctual[;]" "to sustain an ordinary routine without special supervision[;]" to pay attention for extended periods; and "to complete a normal workday and workweek without interruptions from psychologically based symptoms[;] and to perform at a consistent pace without an unreasonable number and length of rest periods." AR 69, 80-81. Ultimately, however, they determined that she could "complete simple and repetitive . . . work," such as that required to be a poultry boner, poultry eviscerator, or poultry dresser. AR 72, 83-84.

Swan requested a hearing before an ALJ. AR 97. After a hearing at which Swan and a vocational expert testified, the ALJ issued a written opinion, denying Swan's request for benefits. 13-23, 29-30. On March 31, 2016, the Appeals Council denied Swan's request for review. AR 1-3. The ALJ's decision is thus the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On June 3, 2016, Swan filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Doc. 3). *See* 20 C.F.R. § 422.210(c). The

7

parties briefed the issues, and the Honorable Leonard T. Strand, Chief Judge of the United States District Court for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISABILITY DETERMINATIONS AND THE ALJ'S FINDINGS

To determine whether a claimant has a disability within the meaning of the Social Security Act, the ALJ must follow a five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); 20 C.F.R. § 404.1520(a). First, the ALJ considers the claimant's work activity and determines whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, the ALJ determines "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). Third, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a listing, that ends the inquiry: the claimant is disabled and entitled to benefits. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). During the fourth step, the ALJ determines whether the claimant is disabled despite failing to meet or equal a listing by assessing the demands of the claimant's past relevant work and by evaluating the claimant's RFC, or "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)); *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform her past relevant work, then the claimant is not disabled. *Lewis*, 353 F.3d at 645. During the fifth step, the ALJ

8

determines whether the claimant is able to perform other work that exists in substantial numbers in the national economy, given the claimant's RFC, age, education, and work experience. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); 20 C.F.R. § 404.1520(a)(4)(v). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff*, 421 F.3d at 790.

In determining whether Swan was entitled to benefits, the ALJ followed the five-step process. First, the ALJ found that Swan had not engaged in substantial gainful activity during the relevant time period. AR 15. Second, the ALJ found that Swan suffered from the following severe impairments: depressive disorder, anxiety disorder, and ADHD. *Id.* The ALJ noted that treatment notes indicated Swan had only "soft signs" of ADHD but was taking medication to treat it. AR 16.

After determining that Swan's impairments did not meet or medically equal one of the presumptively disabling listings in step three, the ALJ determined Swan's RFC in step four. AR 16-21. The ALJ found:

> [Swan] had the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform tasks learned in 30 days with simple work decisions, little judgment and occasional work place changes. She can tolerate only occasional interpersonal interaction. She is unable to work in close proximity with others, such as she cannot stand next to or be involved with others['] tasks or vice versa.

AR 17. The ALJ found that Swan's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely credible." AR 19. The ALJ gave "[o]nly some weight" to Dr. Netolicky's opinion and "limited weight" to Dr. Perkins's opinion of Swan's RFC because they both relied on Swan's statements of her

9

limitations in making their determinations. AR 20-21. The ALJ gave "significant weight" to the opinions of the state agency medical consultants. AR 21. The ALJ noted that Swan was able to perform many activities of daily living, as well as several work activities (although none full time). AR 19, 21. The ALJ also noted that Swan had never been hospitalized nor required inpatient treatment. AR 21.

Based on her assessment of Swan's RFC, the ALJ found that Swan was unable to perform her past relevant work. AR 21. The ALJ found during step five, however, that "jobs . . . existed in significant numbers in the national economy that [Swan] could have performed" given her age, education, work experience, and RFC, including laundry sorter, laundry folder, and retail marker. AR 21-22. Thus, the ALJ found that Swan was not disabled. AR 23.

## III. THE SUBSTANTIAL EVIDENCE STANDARD

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707.

When determining whether substantial evidence supports the ALJ's decision, the court considers all the evidence before the ALJ but "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994); *accord Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court "must search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003). The court must

10

"evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992). In other words, substantial evidence may support the ALJ's decision "even if [the court] might have weighed the evidence differently." *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). "The concept of substantial evidence . . . embodies a zone of choice within which the [ALJ] may decide to grant or deny benefits without being subject to reversal on appeal." *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988).

## IV. DISCUSSION

On appeal, Swan challenges only the ALJ's RFC determination. Swan argues that the ALJ erred by not giving more weight to the opinions of Drs. Netolicky and Perkins, her treating psychiatrist and psychologist, and that the ALJ's RFC determination is not supported by substantial evidence due to the nonsubstantial weight given to her treating doctors' opinions.

### A. Whether the ALJ erred by not giving controlling or substantial weight to the opinions of Swan's treating doctors

When determining a claimant's RFC, "[t]he ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* 20 C.F.R. § 404.1527(c)(2).

11

Even if a treating source's opinion is not given controlling weight, it is generally entitled to substantial weight. *See Papesh*, 786 F.3d at 1132. "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

Here, the ALJ gave "[o]nly some weight" to Dr. Netolicky's assessment of Swan's RFC because "he clearly seemed to rely on [Swan's] statements in rendering his opinion." AR 20. Similarly, the ALJ gave "limited weight" to Dr. Perkins's assessment because she "seem[ed] to heavily rely on the stated limitations perceived and communicated by [Swan]." AR 20-21. Swan disputes that Drs. Netolicky's and Perkins's assessments were based primarily on her subjective statements and argues that, in any event, that is not an appropriate basis for discounting the opinion of a treating doctor.

### 1. Whether Swan's treating doctors based their RFC assessments primarily on Swan's subjective statements

As part of their RFC assessments, Drs. Netolicky and Perkins had to evaluate Swan's mental ability to perform various work activities, including her ability to concentrate, to follow instructions, to interact with coworkers and the public, and to maintain regular attendance. AR 469-71, 474-76. They both noted serious limitations in Swan's ability to pay attention for more than two hours and to deal with work stress, and they both found that she would miss more than four days of work a month due to her

12

impairments.  *Id.*[5]  At the time they evaluated Swan's RFC, Dr. Netolicky had been treating Swan every one to three months for more than four years, and Dr. Perkins had been treating Swan biweekly for almost two years.  AR 467, 471, 472, 476.  This treatment consisted primarily of psychotherapy and, in Dr. Netolicky's case, prescribing medications, although Dr. Perkins administered several neuropsychological tests when she first evaluated Swan in 2012.  AR 448-55, 467, 472.  Treatment notes reflect that the doctors made objective assessments of Swan based on their observations, such as evaluating her mood and grooming, but also that they took note of Swan's communicated feelings of anxiety and mood.  AR 478-503.

Substantial evidence supports the ALJ's determination that Swan's treating doctors' RFC assessments were based on Swan's statements of her limitations.  The only objective testing of Swan was done by Dr. Perkins in 2012, and that testing does not support limitations as severe as those found by Swan's treating doctors.  On the Connors' Continuous Performance Test II—which tests focused, sustained attention—Swan's overall performance "was labeled as good with no indication of attention difficulties." AR 454.  Other tests revealed only "mild difficulties with fluctuating attention and distractibility" in the "quiet, distraction-free testing environment."  *Id.*  The Minnesota Multiphasic Personality Inventory-2 RF indicated that Swan had "cognitive deficits related to memory" and concentration.  *Id.*  It also showed that she suffered from "emotional distress related to anxiety and depression," as well as social avoidance and "feelings of interpersonal persecution."  *Id.*  The neurophysiological test results do not

---

[5] The ALJ's RFC determination did not include these limitations, and the vocational expert testified that no jobs existed for an individual who would miss more than two days of work per month or who could not concentrate more than two hours at a time.  AR 17, 55-57.

speak to many of the abilities evaluated by Drs. Netolicky and Perkins in their RFC assessments, such as Swan's ability to maintain attendance or deal with work stress. Moreover, the test results contradict Drs. Netolicky's and Perkins's assessments regarding Swan's ability to pay attention: they both found that she would be unable to meet competitive standards when it came to maintaining attention for two hours, but the test results indicate only mild difficulties at most. AR 454, 469, 474.

As recognized by Swan in her brief, mental health treatment for anxiety and depression necessarily depends on patients' statements about how they feel. Although Drs. Netolicky and Perkins could evaluate some aspects of Swan's abilities objectively (e.g., her personal hygiene), most of their findings rely on Swan's recitation of how she responded to and felt about certain events. For example, Dr. Netolicky's RFC assessment explicitly notes that Swan "has consistently expressed persistent difficulties in the above domain," suggesting that his findings are based primarily on Swan's expression of her difficulties. AR 471.

Moreover, both doctors' RFC assessments suggest that they found Swan's reports of her work history relevant: Dr. Netolicky noted that Swan had been forced to quit a job recently due to her anxiety and depression and that her work history demonstrated that she would not be able to sustain socially appropriate behavior in the long run. AR 470-71. Dr. Perkins noted that Swan's failed attempts at employment were secondary to her anxiety and interpersonal skills. AR 476. The emphasis on Swan's work history suggests that both doctors relied on Swan's statements regarding the anxiety and stress her various jobs caused her—for example, statements that she felt paranoid about staying on pace and letting her coworkers down, that she felt anxious about making mistakes, and that she could not handle the stress of working. AR 43, 348-49, 483, 494-95. The ALJ could reasonably find that Drs. Netolicky and Perkins based most of their findings

14

in their RFC assessments on subjective statements Swan made during psychotherapy sessions—including their findings of limitations in maintaining attention, following instructions, interacting with people, performing at a consistent pace, dealing with work stress, and maintaining work attendance.[6]  AR 469-71, 474-76.

### 2. Whether the ALJ gave a "good reason" for the weight given to Swan's treating doctors' opinions

Next, I address whether the ALJ gave a "good reason" for the weight given to Swan's treating doctors' opinions.  The ALJ found Swan exaggerated "the intensity, persistence and limiting effects of [her] symptoms."[7]  AR 19.  Thus, the ALJ gave only some and limited weight to her treating doctors' opinions because those opinions were based on Swan's subjective statements of her symptoms.  AR 20-21.  Because Swan's treating doctors relied on Swan's discredited description of her limitations when determining her RFC (as opposed to "medically acceptable clinical and laboratory diagnostic techniques"), the ALJ was not required to give their opinions controlling weight.  *See Julin v. Colvin*, 826 F.3d 1082, 1085, 1089 (8th Cir. 2016) (holding that the ALJ "permissibly declined to give controlling weight to [the treating doctor's] opinions on [claimant's] work-place limitations" that "relied on [claimant's] subjective complaints" of depression and anxiety when the ALJ had found the claimant not credible);

---

[6] Swan's argument that Dr. Perkins's use of technical language in her RFC assessment demonstrates she did not simply "parrot" Swan's statements misses the mark.  Dr. Perkins's findings of "[p]rofound limitations in stress reactivity" and tenuous "social [and] interpersonal relationships" depend on Swan's statements made during psychotherapy regarding her feelings of anxiety and stress.  AR 476.

[7] Swan does not challenge this credibility finding.

15

*Papesh*, 786 F.3d at 1132-33 (holding that the ALJ's finding that the treating doctor's opinion "appears to be based on the claimant's subjective assertions of pain" was a "potential bas[i]s to not give *controlling* weight to [the] opinion").

A closer issue is whether the ALJ could give Swan's treating doctors' opinions nonsubstantial weight because they were based on her discredited subjective complaints. Swan relies on *Papesh*, which held that the ALJ "offered no basis to give the [treating doctors'] opinion[s] non-*substantial* weight" when the ALJ found that the opinions "appear[] to be based on the claimant's subjective assertions of pain." 786 F.3d at 1132-33. In *Papesh*, as here, one of the treating doctor's RFC assessments consisted primarily of a checklist form. *Id.* at 1129-30. But *Papesh* can be distinguished on the basis that, unlike here, the claimant was found to be credible: although the ALJ in *Papesh* discredited the claimant's subjective allegations of pain, the Eighth Circuit suggested that the ALJ erred in doing so. *Id.* at 1134-35; *cf. Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (holding that objective data supported the treating doctor's RFC assessment, that the claimant was credible, and that the ALJ thus erred in "declin[ing] to accept portions of" the treating doctor's RFC assessment based on the claimant's subjective complaints); *see also Barton v. Berryhill*, No. 15-cv-1723-DDN, 2017 WL 878036 (E.D. Mo. Mar. 6, 2017) (distinguishing *Papesh* because in that case, the treating physician's opinion "was consistent with the overall record, . . . comported with [claimant's] own credible description of her limitations, and . . . contradicted only *one* other doctor's opinion").

Furthermore, to the extent *Papesh* holds (if at all) that an ALJ may not decline to give substantial weight to a treating doctor's opinion merely because it is based on the claimant's subjective statements, numerous Eighth Circuit cases issued both before and after *Papesh* hold otherwise. In *Finch v. Astrue*, 547 F.3d 933, 936-37 (8th Cir. 2008),

16

the court held that because "the ALJ found [claimant's] subjective reports of pain not entirely credible, [a treating doctor's RFC] assessment based on those reports was appropriately not given substantial weight." In *Julin*, the court noted that "[b]ecause the ALJ declined to credit [claimant], the ALJ was entitled to discount [the treating doctor's] opinions insofar as they relied on [claimant's] subjective complaints."[8] 826 F.3d at 1085, 1089. Similarly, in *Reece*, the court noted that the ALJ "may give [the] treating physician's opinion less deference when it is based on claimant's subjective complaints rather than objective medical evidence." 834 F.3d at 906, 909-10 (citing *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014)) (affirming the ALJ's decision to "find[] unpersuasive" and "discount[]" the treating doctor's opinion when it was based on the claimant's subjective complaints and inconsistent with both the claimant's activities of daily living and the opinions of nontreating doctors). And in *Cline*, the Eighth Circuit noted that the ALJ "'was entitled to give less weight to [the treating doctor's] opinion, because it was based largely on [claimant's] subjective complaints rather than on objective medical evidence,' and could further discount or disregard any conclusions based on [claimant's] discredited subjective complaints." 771 F.3d at 1104 (citations omitted) (quoting *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)) (affirming the ALJ's decision to give "little weight" to the treating doctor's opinion when it was in checklist form, contained limitations not mentioned in treatment notes, and was based on the claimant's discredited subjective complaints of pain); *see also Rankin v. Apfel*, 195 F.3d

---

[8] The amount of weight given to the treating doctor's opinion by the ALJ in *Julin* (and affirmed by the Eighth Circuit) is unclear, but it seems that the weight was nonsubstantial for the portions of the opinion based on the claimant's subjective complaints. *See* 826 F.3d at 1089 ("The ALJ . . . permissibly declined to give controlling weight to [the treating doctor's] opinions . . . . [C]ontext shows that [the treating doctor's] opinions were still given substantial weight when they were neither conclusory nor premised on [claimant's] subjective complaints.").

17

427, 429-30 (8th Cir. 1999) (holding that the ALJ could discount the treating physician's opinion because it was "based heavily on [claimant's discredited] subjective complaints and . . . at odds with the weight of the objective evidence, including [claimant's] daily activities and his physical-therapy records").  Accordingly, I recommend finding that the ALJ did not err in assigning only some and limited weight to the opinions of Swan's treating physicians, since those opinions were based on Swan's subjective statements of her symptoms that the ALJ found exaggerated.

### B. Whether some medical evidence supports the ALJ's RFC determination

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  The ALJ's RFC determination must be supported by at least some medical evidence that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).  Because the ALJ did not give substantial weight to the opinions of Swan's treating doctors, Swan argues that no medical evidence supports the ALJ's RFC determination.

Swan relies on cases where, unlike here, the record is devoid of an RFC assessment from a treating doctor.  *See Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *Morris v. Colvin*, No. 14-cv-4068-LTS, 2016 WL 3360506, at *10 (N.D. Iowa June 16, 2016); *Hattig v. Colvin*, No. 12-cv-4092-MWB, 2013 WL 6511866, at *11 (N.D. Iowa Dec. 12, 2013). Merely because the ALJ gave Swan's treating psychiatrist's and treating psychologist's RFC assessments "some" and "limited" weight, respectively, does not mean that no

18

medical evidence from a treating physician supports the ALJ's RFC determination. *See, e.g.*, *Julin*, 826 F.3d at 1089 (holding that some medical evidence supported the ALJ's RFC determination when the ALJ adopted some of the limitations set forth by the treating physician, but not those limitations "premised on [claimant's] subjective complaints").

Here, the ALJ incorporated some of the limitations found by Drs. Netolicky and Perkins into her RFC determination. For example, Drs. Netolicky and Perkins noted Swan faced serious difficulties in understanding and carrying out detailed instructions, interacting with people, and responding appropriately to changes in a routine setting. AR 469-70, 474-75. The ALJ's RFC determination recognized these limitations:

> [Swan] can perform tasks learned in 30 days with simple work decisions, little judgment and occasional work place changes. She can tolerate only occasional interpersonal interaction. She is unable to work in close proximity with others, such as she cannot stand next to or be involved with others['] tasks or vice versa.

AR 17.

The ALJ's RFC determination, however, does not include Drs. Netolicky's and Perkins's findings that Swan could not pay attention for two hours, maintain socially appropriate behavior, make it through a workday or work week without interruptions from her impairments, sustain an ordinary routine without special supervision, or miss less than four days of work a month. AR 469-71, 474-76. Instead, the ALJ relied on the opinions of two state agency medical consultants, who had found that Swan faced no or moderate limitations in those areas.[9] AR 21, 68-69, 80-81. The ALJ did not include these limitations because they were based on Swan's subjective complaints and were

---

[9] The state agency consultants did not explicitly address how many days of work a month Swan would miss due to her impairments, but they did find her only moderately limited in her ability to maintain regular attendance. AR 69, 80.

inconsistent with Swan's daily-living and work activities. AR 17-21. For example, Swan testified at the hearing that she was able to work on her jewelry for two hours at a time, and she had previously reported working four hours at a time on her jewelry—suggesting that she could maintain attention for two hours. AR 44, 242, 469, 474.

The record demonstrates that Swan had at most mild difficulties in her activities of daily living—she cleaned, ran errands, prepared meals, took care of pets, managed her finances, bathed and dressed herself, hung out with friends, went to church, read, and watched television. AR 195-97, 214-15, 261-64. Swan's self-reported history of attempting and quitting jobs due to anxiety is the only basis in Dr. Netolicky's and Perkins's treatment notes for many of the limitations in their RFC assessments (including that Swan could not handle work stress and would miss more than four days of work a month). But all the jobs that Swan quit within a few months due to stress required her to interact with the public or her coworkers on a routine basis. AR 37-39, 43, 348-49, 483. She managed to work as a housekeeper for three years without being overwhelmed by anxiety when she was largely left to herself. AR 41-42, 190, 241, 350. Similarly, she has made jewelry at home by herself for more than ten years. AR 44, 241, 301, 450. The ALJ included limitations recognizing that Swan has difficulties interacting with other people, whether her coworkers or the public. AR 17. It was not error for the ALJ to decline to include those limitations supported only by Swan's subjective complaints and not borne out by her daily-living or work activities.

Some medical evidence thus supports the ALJ's RFC determination: the ALJ adopted the limitations found by the state agency medical consultants in their RFC assessments, and the ALJ adopted some of the limitations found by Swan's treating doctors in their RFC assessments (but not those limitations based on Swan's subjective complaints and unsupported by her activities of daily living and work history). *See, e.g.,*

20

*Julin*, 826 F.3d at 1089; *Strongson v. Barnhart*, 361 F.3d 1066, 1070-72 (8th Cir. 2004) (holding that the ALJ's mental RFC determination was supported by substantial evidence when the ALJ incorporated some, but not all, of the limitations in the treating psychologist's opinion and included "similar functional limitations" as those found in the opinions of two of the claimant's one-time examining consultants); *Anderson v. Shalala*, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; the opinions of treating physicians to the extent they were based on objective evaluations, but not the claimant's subjective complaints; and an independent analysis of the medical evidence). This is not a case in which the record contains no RFC assessment from a treating source. Neither is this a case in which no RFC assessment—whether from a treating or reviewing source—supports the ALJ's RFC determination. *Cf. Lauer v. Apfel*, 245 F.3d 700, 704-06 (8th Cir. 2001) (holding that the ALJ's RFC determination was not supported by substantial evidence when the ALJ found fewer limitations than the claimant's treating physicians, whose opinions the ALJ did not adopt, and the nonexamining consultant based his opinion on incomplete treatment records and fewer impairments than those found by the ALJ). Although I might have weighed the evidence differently, substantial evidence, including some medical evidence, supports the ALJ's RFC determination.

## V.    CONCLUSION

The court recommends that the district court affirm the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure

72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 27th day of June, 2017.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa